UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

UNITED STATES OF AMERICA        :      12 Cr. 712 (SHS)

    -v.-                         :      18 Civ. 7716 (SHS)

ROGER KEY,                      :

            Defendant.      :

---------------------------------------------------------------x

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE OR CORRECT HIS SENTENCE

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
Attorney for the United States of America

Abigail S. Kurland
Assistant United States Attorney
- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA          :        12 Cr. 712 (SHS)

   -v.-                          :        18 Civ. 7716 (SHS)

ROGER KEY,                         :

                Defendant.      :

-----------------------------------------------------------------x

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO THE DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255
TO VACATE, SET ASIDE OR CORRECT HIS SENTENCE**

The Government respectfully submits this memorandum of law in opposition to the

motion of the defendant under 28 U.S.C. § 2255 to vacate, set aside or correct his sentence, as

well as his motion pursuant to Federal Rule of Civil Procedure 60.

**PRELIMINARY STATEMENT**

Roger Key, a/k/a "Luchie," ("Petitioner") filed this Petition in connection with a

judgment of conviction entered on March 27, 2015 following a two-week jury trial before this

Court. On March 27, 2015, Key was sentenced to life imprisonment on Count One, a concurrent

ten years' imprisonment on Counts Three, Four and Six, a consecutive five years' imprisonment

on Count Two, and a consecutive 25 years' imprisonment on Count Five, for a total sentence of

life imprisonment plus 30 years.

Key filed an appeal arguing that: (1) the evidence was insufficient to support his

conviction for one of the charged murder-for-hire conspiracies; (2) this Court erred when it

denied Key's motion to suppress certain physical evidence and testimony; (3) and there was

prejudicial spillover as to Counts One and Two. *See United States v. Key, et al.*, 14-3739 (cr).

On April 17, 2017, the Second Circuit rejected all of Key's arguments and upheld his conviction, and on July 12, 2017, the mandate issued. *United States v. Key, et al.*, 854 F.3d 163 (2d Cir. 2017). Over one year later, on August 17, 2018, Key filed the instant Petition. Dkt. No. 640. Then on November 6, 2018, Key filed a motion for relief pursuant to Federal Rule of Civil Procedure 60.

### BACKGROUND

Indictment S9 12 Cr. 712 (SHS) (the "Indictment") was filed on February 25, 2014, in nine counts. Count One charged Key with conspiracy to distribute five kilograms and more of cocaine and 280 grams and more of crack, in violation of Title 21, United States Code, Sections 841(b)(1)(A). Count Two charged Key with using, carrying, and possessing firearms in connection with the narcotics conspiracy charged in Count One, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2. Counts Three and Four charged Key with conspiracy to commit and the attempted murder-for-hire of Matthew Allen (the "Allen Murder Plot" or "Allen Attempted Murder"), in violation of Title 18, United States Code, Sections 1958 and 2. Count Five charged Key with aiding and abetting the discharge of a firearm in connection with the Allen Murder Plot and the Allen Attempted Murder, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii), (c)(1)(C)(i) and 2. Counts Six and Seven charged Key with conspiracy to commit and the murder-for-hire of Terry Harrison (the "Harrison Murder Conspiracy" or "Harrison Murder," respectively), in violation of Title 18, United States Code, Sections 1958 and 2. Count Eight charged Key with murder in connection with the Count One narcotics conspiracy, in violation of Title 21, United States Code, Section 848(e)(1)(A). Finally, Count Nine charged Key with aiding and abetting the use of a firearm to commit murder in connection with the Harrison Murder Conspiracy and the Harrison Murder, in violation of Title

18, United States Code, Sections 924(j)(1) and 2.  On March 6, 2014, the Government filed a

Prior Felony Information ("PFI"), pursuant to Title 21, United States Code, Section 851. On

March 12, 2014, the Government filed a second PFI.

### I.        The Conduct Underlying the Charges Against Petitioner

The charges arose out of the Government's investigation into a criminal drug trafficking

organization (the "Organization" or "DTO") that operated in Upper Manhattan and the Bronx,

New York.  In or about the early 1990s, Key began selling street-level quantities of crack

cocaine and heroin in and around the Jackson and Melrose Housing Projects near Courtlandt

Avenue (the "Courtlandt Projects") in the Bronx. Key spent much of the 2000s in prison

following a New York State manslaughter conviction and a federal narcotics conviction. By in or

about 2010, shortly after Key was released from federal custody, through violence, intimidation,

and careful organization, Key grew to become a high-level drug distributor in New York City.

Through the time of his arrest in September 2012, Key regularly distributed millions of dollars of

cocaine to major drug organizations in Manhattan and the Bronx. Key also continued to oversee

his own street-level drug distribution organization, which operated, among other areas in the city,

in and around the Courtlandt Projects.

Key used several young men, including a number of young teenagers, to sell crack

cocaine supplied by Key (the "321 Crew") in and around an apartment building located at 321

East 153rd Street (the "321 Building" or "Headquarters"). Beginning in or about 2010, the 321

Crew became involved in a violent conflict over drug-trafficking territory with a rival drug crew,

which was led by Terry Harrison, a/k/a "T Money" (the "Harrison Crew").  Key worked with

others, including members of the 321 Crew, to kill Harrison. Key's goal in orchestrating

Harrison's murder was clear: to remove his drug trafficking rival and to take back control of the

drug selling territory in and around the Courtlandt Projects. On Key's orders, on September 10, 2010, Kevin Wilson shot and killed Harrison; a few hours later, Key paid Wilson $1,000 for the murder.

At the same time, Key's drug-trafficking activities reached well beyond the Courtlandt Projects. From in or about 2009 through the time of his arrest, Key worked as a drug supplier to high-level traffickers in Manhattan and the Bronx. Specifically, Key supplied millions of dollars of cocaine to groups of traffickers in Harlem; one of Key's main drug customers was Ruben Davis, the leader of a Harlem-based drug trafficking organization. Ruben Davis re-distributed Key's cocaine to wholesalers and to street-level crews under Ruben Davis' control, who would then sell the cocaine to customers in Harlem and elsewhere in New York City.

Key and Davis ran a sophisticated drug operation: they used several apartments throughout Manhattan and the Bronx, which members of the conspiracy referred to as "offices," and where narcotics and narcotics proceeds were stored; Davis installed security cameras in at least one of these apartments to protect his drugs and to detect the presence of law enforcement; firearms were stored in the stash apartments to protect the valuable drugs; and Davis employed drivers to deliver narcotics to customers and to collect money in connection with drug sales.

Key and Aisha Babilonia were in a romantic relationship. Prior to and during her relationship with Key, Babilonia had been in a long-term relationship with her abusive boyfriend, Matthew Allen. When Babilonia and Key entered into their romantic relationship, Allen was incarcerated. When Allen was released from prison, he continued to abuse Babilonia. Tired of Allen's abuse, rather than pursuing lawful channels, Babilonia instead turned to Key to resolve her situation. She entered into a conspiracy with Key, and others, to stalk Allen. In turn, Key hired Jiya Canady, one of his associates, to kill Allen.

On or about November 16, 2011, using a gun Key provided, and tipped off by Babilonia, Canady and Jose Capriata went to an address in Brooklyn where they believed Allen was staying. Capriata fired several times at a male he mistakenly believed to be Allen, instead shooting an innocent bystander. Despite the error, Key paid Canady $7,500 in cash that night.

## II.     Key's Trial and Conviction

### 1.   The Government's Case

Key's trial began on March 17, 2014.  At trial, the Government called approximately 25 witnesses, including: (i) six cooperating witnesses; (ii) multiple current and former law enforcement officers, including a Federal Bureau of Investigation ("FBI") special agent who was a member of the Cellular Analysis Survey Team ("CAST"), members of a Drug Enforcement Administration ("DEA") task force who were investigating Key and Davis, several members of the New York City Police Department ("NYPD") including the police officer who responded to the scene of the Harrison murder, a detective who searched one of Key's stash apartments, and a detective who conducted surveillance of Davis and other members of the Organization; (iii) a physician from the medical examiner's office who performed the autopsy on Harrison; (iv) Key's federal probation officer; and (v) Key's jeweler.

The Government also introduced wiretap recordings from Davis' phone, which captured inculpatory conversations between Davis, Key and other coconspirators regarding the Organization's drug dealing.  The Government also presented physical evidence, including the contents of electronic items seized at the time of Key's arrest, narcotics packaging paraphernalia covered in cocaine residue from one of Key's stash apartments, the firearm used in connection with the Allen Attempted Murder, the global positioning system ("GPS") tracking device placed in Allen's car by Key and Canady, a photograph of $10,000 in cash seized from Key during a car

5

stop, photographs of relevant locations and individuals, phone records, cell site records, DMV records, bank records, and license plate recognition ("LPR") data. (Tr.[1] 1606-1684, 1372-75, 425-33, 687-89, 750-51, 1493-95, 1523-1563, and 1365-1371).

The evidence clearly established, *inter alia*, the existence of the Organization, led by Key, which distributed over 450 kilograms of powder cocaine and crack; the murder-for-hire plan devised by Key and members of the Organization to murder drug rival Harrison; the murder-for-hire plan devised by Key, Babilonia and members of the Organization to murder Allen; and the various related firearms offenses.

### a. **Key's Drug Trafficking Organization**

Key's Organization distributed large quantities of cocaine and crack cocaine throughout New York City. (Tr. 575, 1125, 1396 (testimony of cooperating witnesses Thomas, Williams and Tarleton)). The Organization's members also frequently possessed and used guns both to protect the Organization's drug-selling territory and to attack rival drug-traffickers and crews. (Tr. 826, 921-23, 936-38, 1139, 1144-46). The Organization had several stash apartments throughout the Bronx and Upper Manhattan, including locations at Bruckner Blvd., 1579 Metropolitan Avenue, 3540 Dekalb Avenue, and 95 Lenox Avenue. (Tr. 1278).

Ruben Davis was one of Key's best wholesale customers, purchasing dozens of kilograms of powder cocaine from Key, which Davis would redistribute in powder form or in crack form to other drug dealers. (Tr. 1115, 1125, 1392-1396). Key also supplied other drug dealers in New York City, and was known to be ruthless in his collection of drugs debts owed to him, including using threats of violence. (Tr. 1401-06, 1410, 556).

---

[1] "Tr." refers to the transcript of Key's Trial; "Sent. Tr." refers to the transcript of Key's sentencing; "Def. Sent. Mem." refers to Key's sentencing memorandum; and "Govt. Sent. Mem." refers to the Government's sentencing memorandum.

Key Organization was incredibly lucrative.  Evidence at trial included photographs and testimony regarding Key's wealth, inconsistent with his purported legitimate income, including expensive cars – such as Key's two Audi Q7s, multiple Bentleys, a Lamborghini, a black Infinity and a Ferrari (Tr. 118, 546, 645, 1080) --- and his habit of spending thousands of dollars on champagne and other alcohol at various night clubs.  (*E.g.*, Tr. 1413).  Key's jeweler, George Babekov, testified at trial about the expensive jewelry he had made for Key.  Babekov called Key "Dirtbag" because Key wore a pendant with that moniker.  (Tr. 1466).  Babekov created another large sized pendant for Key, made of white gold and white and black diamonds, with the legend "#1Boiz, promote your party, promote your funeral," which cost around $20,000. (Tr. 1467-71).  Key paid Babekov for the jewelry in cash.  (Tr. 1475).

Yet, Key was cautious regarding his ill-gotten wealth.  For example, Key asked Canady to register an inexpensive used car in Canady's girlfriend's name, so that Key could use it without arousing the suspicion of law enforcement.  (Tr. 135-37).  As corroborated by DMV records, Canady did register an old maroon Dodge in his girlfriend's name and Davis was surveilled and photographed using that car. (Tr. 750-53, 1282-85).  During the time he was running his drug Organization, Key told his probation officer that he was employed as a flagger at San Mateo construction, and provided with documentation purporting to show that he worked there forty hours per week for $10 per hour.  (Tr. 734-735, 742).  In fact, Key's purported employment was a low-paying, no-show job that Key arranged in order to keep up the appearance of a law-abiding life and hide his illegal activity from his probation officer.  (Tr. 1397-98, 1420-23, 733).

7

### b.  **Key's Murder-For-Hire Plot of Matthew Allen[2]**

In Fall 2011, Key asked Jiya Canady to kill Matthew Allen for $10,000.  (Tr. 148).  Key told Canady that Key wanted to kill Allen because he was abusing Allen's then-girlfriend and Key's paramour, Aisha Babilonia.  (Tr. 146).  Key also stated that Babilonia's family was involved in importing large quantities of cocaine from South America, and he wanted to ingratiate himself into Babilonia's family to shore-up an additional supply of powder cocaine by killing her abusive boyfriend. (Tr. 228-29).

Key and Canady, however, had never met Allen and therefore did not know what their target looked like.  (Tr. 154).  In order that Key might recognize the target, on October 27, 2011 Key sent a text message to Babilonia in code, saying that he was "looking for a better copy of the home work u sent me it wasn't clear." (Tr. 154-57, 159, 1621-22).  In response, Babilonia texted Key a photograph of Allen with his brothers, which Key showed to Canady.  (Tr. 1622).  Canady in turn showed this picture to Jose Capriata on the night of the attempted murder of Allen.  (Tr. 188).  This photograph was subsequently recovered from an iPhone in Key's possession.  (Tr. 1621-22).

Ultimately Canady agreed to commit the murder and over the next several weeks, Canady and Key had a series of discussions about how and where to commit the murder.  (Tr. 150-155, 160-79).  Key gave Canady two firearms to use to kill Allen – one revolver and one semi-automatic pistol.  (Tr. 164).  In the thick of the plot and about a month before the November 16, 2011 attempt on Allen's life, Babilonia texted Key and told him that she wanted to seal the deal.  Key immediately responded "K."  (Tr. 1621).

---

[2] Because it is not at issue in this Petition, the Government will not review in detail the facts surrounding the Harrison Murder Conspiracy and assumes that the Court, which presided over Key's trial, is familiar with the facts.

Canady and Key traveled together to a "spy store" in Manhattan and purchased a portable GPS tracking device, which Key wanted Canady to affix to Allen's Escalade in order to track and kill Allen. (Tr. 174-75, 1527-29). Babilonia drove Allen's car to Canady's apartment in the Bronx, where Canady and Key placed the GPS underneath the carriage of Allen's SUV. (Tr. 179-82). Babilonia sat in Allen's car while Key and Canady studied the car for about an hour to decide where to place the tracking device, including using a flashlight and crawling under the car. (Tr. 180-81). Once the GPS device was affixed to Allen's car, Babilonia and Key left. (Tr. 182, 1527-41).

On November 16, 2011, Canady received a call from Key, who told Canady that Allen was on his way to 302 Brooklyn Avenue, Allen's parole address. (Tr. 183). Key told Canady to meet him on 7th Avenue in Harlem in order to pick up a shooter, Capriata, who was supplied by Davis. (Tr. 181-85). Canady met Key, Davis and Capriata at 115th Street and 7th Avenue in Harlem. Canady and Capriata then drove to Brooklyn. (Tr. 186-88). That night, Canady was driving an Audi Q7 car bearing license plate FBZ 3330, which was provided by Key and which was registered in the name of Tanisha Waiters, Key's wife. (Tr. 186, 750-51). The Audi and license plate was captured on license plate readers on the drive to and back from Brooklyn. (Tr. 1365-71). During the ride to Brooklyn, Canady provided to Capriata a .38 revolver, which Key had provided to Canady. (Tr. 189-90).

When they arrived in Brooklyn, Canady parked and waited with Capriata. (Tr. 189). A few minutes later, Allen's Escalade arrived. (Tr. 190). Canady then let Capriata out of Key's Audi, and drove around the block as Capriata began to approach what they believed to be Allen's SUV. (Tr. 190-91). Canady picked up Capriata, who told Canady that he had shot the target. Canady then drove Capriata back to Harlem and took back the .38 revolver. (Tr. 192). Key and

9

Davis were waiting at the location in Harlem, and told Canady that the wrong person had been shot. (Tr. 194). In fact, an innocent bystander was shot three times.

Key knew that Capriata and Canady had shot the wrong person because soon after the shooting, Allen called Babilonia and told her that his neighbor – the "writer"[3] – had been shot and that Allen believed the gunman was aiming for Allen. (Tr. 194, 1493-1496). Babilonia called Key and reported back that they had shot the wrong person and that Allen was still alive. (Tr. 194-95, 1493-1496). Beginning at around 9:34 pm on November 16, 2011, Babilonia's cellphone was in frequent contact with cellphones used by Key, throughout that night and into the early morning hours of November 17. In turn, Key's phone was in regular contact that night with the cellphone being used by Canady. (Tr. 1493-1496). Despite shooting the wrong person, Key nevertheless paid Canady approximately $7,300 in cash that night, a portion of which bank records demonstrated was deposited into Canady's account. (Tr. 197, 1672).

Following the attempted murder of Allen, Key attempted to reassure Babilonia that he would not cooperate with law enforcement. Via text message Key assured Babilonia regarding his loyalty:

> My real name is ROGER KEY my state ID number is 00a2960, my federal ID number 43656-054 u can look up both my charges n see the time I got, go to DOCS for the state an go to BOP for my federal case there's no traces of rat in my blood. . . . I am an all the way stand up nigga[.]

(Tr. 1626). Several weeks later, Canady learned from Key via text messages that Matthew Allen had been killed. (Tr. 201). The messages instructed Canady to watch the local news which was reporting on Allen's shooting death. (Tr. 200, 496-97).

---

[3] The victim of the shooting testified that he was a freelance music journalist. (Tr. 68).

### 2.    The Defense Case and Verdict

Prior to closing arguments, the Court inquired about whether or not Key wanted to testify and Key replied, in sum and substance, "no." (Tr. 1727-28). The defense case was presented primarily through jury argument and vigorous cross examination of the Government's witnesses. On April 2, 2014, the jury convicted Key on Counts One through Six, and acquitted him on Counts Seven through Nine.

### 3.    Sentencing

Prior to sentencing, Key objected to the second PFI, which was predicated upon his youthful offender conviction in Bronx County Supreme Court for criminal sale of a controlled substance in the 3rd degree. *See* Dkt. No. 566. In response, the Government also noted that this argument was meritless and ran contrary to Second Circuit precedent. This Court ruled against Key and on March 26, 2015, Key was sentenced to a mandatory term of life imprisonment on Count One; a concurrent ten years on each of Counts Three, Four and Six; and a consecutive 5 and 25 years' imprisonment on Counts Two and Five, respectively, for a total term of life plus 35 years' imprisonment. Key filed a notice of appeal.

### 4.    Key's Appeal

On appeal, which was handled by retained appellate counsel who was different from Trial Counsel, Key raised a number of issues. Specifically, Key claimed that: (1) the evidence was insufficient to support his conviction for the conspiracy to murder Harrison; (2) this Court erred when it denied Key's motion to suppress certain physical evidence and testimony; and (3) that there was prejudicial spillover as to Counts One and Two. *See United States v. Key, et al.*, 14-3739 (cr). On April 17, 2017, the Second Circuit rejected all of Key's arguments as meritless

11

and upheld his conviction.  *United States v. Key, et al.*, 854 F.3d 163 (2d Cir. 2017).  Key filed

this Petition.

## ARGUMENT

### THE DEFENDANT'S PETITION IS MERITLESS

Key claims trial counsel was ineffective: (1) during plea bargaining; (2) for failing to

move to suppress historical cell-site location information ("CSLI"); (3) for promising evidence in

his opening statement that was not introduced at trial; (4) for depriving Petitioner of his right to

testify; and (5) for failing to object to the Court sentencing Petitioner without submitting "the

drug quantity issue" to the jury.  Pet. at 6-10, 19; 28, 30.  Key also challenges one of his firearm

convictions because "the underlying conspiracy in aid of racketeering offense fails to qualify as

the requisite 'crime of violence'."  Pet. at 12.  Next, Key argues that the enhanced sentencing

provisions of 21 U.S.C. Section 851 are unlawful based on the Supreme Court ruling in *Mathis v.*

*United States*, 136 S. Ct. 2243.  Pet. at. 15. Key argues that he merits a new trial on Counts One

and Two because of purported retroactive misjoinder.  Pet. at 31.  Finally, in a subsequently filed

motion, Key argues that Federal Rule of Civil Procedure 60 affords him relief.

### I.      Key Received Effective Assistance of Counsel

#### A.      General Law

To prevail on a claim of ineffective assistance of counsel, a defendant must:

(1) demonstrate that counsel's performance "fell below an objective standard of reasonableness"

under "prevailing professional norms," and (2) "affirmatively prove prejudice" from the alleged

dereliction in counsel's performance.  *Strickland v. Washington*, 466 U.S. 668, 687-88, 693-94

(1984); *accord United States v. De La Pava*, 268 F.3d 157, 163 (2d Cir. 2001).  The burden is on

Key to establish both prongs.  *Strickland*, 466 U.S. at 687.

12

With respect to the first prong, a court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689). The performance inquiry examines the reasonableness of counsel's actions under "all the circumstances," *Greiner v. Wells,* 417 F.3d 305, 319 (2d Cir. 2005) (citing *Strickland*, 466 U.S. at 688), and from the perspective of counsel at the time, *id.* (citing *Rompilla v. Beard*, 545 U.S. 374, 389 (2005); *Strickland*, 466 U.S. at 689). Counsel is "strongly presumed" to have exercised reasonable judgment in all significant decisions. *Id.* (citing *Strickland*, 466 U.S. at 690). Additionally, an action or omission that "might be considered sound trial strategy" does not constitute ineffective assistance. *Strickland*, 466 U.S. at 689.

With respect to the second prong, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

### B. Trial Counsel Was Not Ineffective in Connection with Plea Bargaining

Key claims that Trial Counsel was ineffective in connection with advising Petitioner regarding a plea offer extended by the Government. Specifically, Key claims that Trial Counsel did not inform Petitioner about the significance of CSLI regarding the Allen Murder Plot. Had Petitioner been aware, and appreciated the significance of, the evidence, Petitioner argues that would have accepted "a" plea offer.[4]

---

[44] Significantly, and fatally to this claim, Petitioner does not assert that he would have accepted the actual plea offer extended by the Government.

### a.   Applicable Law

A defendant is entitled to the effective assistance of counsel in connection with plea negotiations because one of the basic duties of a defense attorney is to provide clients with the benefit of his or her advice on whether to plead guilty. *See Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012); *Purdy v. United States*, 208 F.3d 41, 44-45 (2d Cir. 2000). "As part of this advice, counsel . . . should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." *Purdy v. United States*, 208 F.3d at 45; accord *Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012) ("defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused"). An attorney's failure to advise his client adequately about the decision to plead guilty may constitute constitutionally deficient performance. *See, e.g., Cullen v. United States*, 194 F.3d 401, 404 (2d Cir. 1999); *United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998); *Boria v. Keane*, 99 F.3d 492, 496-97 (2d Cir. 1996). To establish a Sixth Amendment violation, the petitioner must establish that his attorney in fact failed to communicate a plea offer or failed to provide objectively reasonable advice about the decision to plead guilty.[5] *United States v. Gordon*, 156 F.3d at 380; *Boria v. Keane*, 99 F.3d at 496-98.

### b.  Facts

During the investigation, the Government obtained CSLI for cell phones used by Key and others during the Allen Murder Plot. Following Key's arrest, at the first conference before this Court, the Government stated that the evidence consisted of "cell site records for cell phones

---

[5] Key does not allege that his Trial Counsel failed to communicate the oral plea offer.

involved in the murder for hire conspiracy."[6]  (September 27, 2012 Tr. at 2.)  Corresponding records for some of the cellular phones were produced to defense counsel that same day. Discovery continued throughout the pendency of the case on a rolling basis.

At a subsequent bail argument before this Court, the Government noted that a cooperating witness's testimony regarding the Allen Murder Plot would be corroborated by historical cell site data.  (Nov. 20 Bail Argument Tr. 8.)  The Government also stated that the historical cell site information would demonstrate that phones used by Petitioner and a coconspirator traveled to a "spy store" to "purchase a GPS to stalk the intended victim. . . . so they knew where to find him."  (Nov. 20 Bail Argument Tr. 9-10.) Based, in part, on the Government's proffer of proof, the Court denied Key's bail application.

Approximately a year and a half later and more than a week before trial began, on March 6, 2014, Trial Counsel agreed to admit the aforementioned phone records via stipulation, which was signed and emailed to the Government that same day.  On March 7, 2014, the Government voluntarily made early disclosure of 3500 material to Trial Counsel, which included the resume for Agent Perry, a certified member of the FBI's CAST Team.

At trial the Government introduced CSLI for two cellular phones utilized by Key, and one cellular phone utilized by Babilonia and Canady each.  Trial commenced on March 18, 2014 and Agent Perry testified regarding the CSLI on March 27. His testimony primarily focused on three discrete dates: (1) October 31, 2011, when phones utilized by Canady and Key traveled to a spy store where they purchased a GPS device to track Allen; (2) a few days later when Babilonia

---

[6] The first indictment charged Key with the Allen Murder Plot and not with the Harrison Murder Conspiracy.  Key was originally represented by retained counsel Alberto Ebanks.  Gerald J. McMahon (Trial Counsel) filed his notice of appearance less than three months later on December 10, 2012.  Dkt. No. 11.

and Key brought Allen's car to Canady's home to place the GPS on the car; and (3) the November 16, 2011 shooting.  (Tr. 1496-1599.)

On March 25, 2014, the Government informed the Court that the Government intended to call Agent Perry imminently.  (Tr. 1201).  The evening of March 26, 2014, the Government produced to Trial Counsel Government Exhibit 40, a demonstrative exhibit summarizing the phone records from the three aforementioned dates. (Tr. 1355-56.)  When Trial Counsel objected to the introduction of GX 40 the next day, the Government noted that for at least one year before trial commenced, Trial Counsel was well-aware that the evidence against Key included cell site data and that Trial Counsel had these records for an extended period of time.  (Tr. 1363.)  This Court allowed introduction of the report as a demonstrative, scheduled Agent Perry to testify on Thursday and gave Trial Counsel the option of beginning his cross-examination on Friday.  (Tr. 1362-63.)  Trial Counsel chose to proceed with his rigorous cross-examination directly after Agent Perry's direct testimony finished.

### c.  Discussion

At the final pre-trial conference the Government noted that an oral plea offer was communicated to Trial Counsel and it was relayed to Petitioner who rejected the offer.  *See* March 13, 2014 Conference Tr. at 76.  Petitioner now claims that because the Government only disclosed the CSLI the "night before trial," and therefore Trial Counsel was not afforded an opportunity to investigate the records, consequently he could not counsel defendant regarding the plea offer.  Pet. at 7.  Petitioner self-servingly claims that had he known the incriminating nature of the CSLI in a "timely" manner, he would have accepted a plea.  *Id.*[7]

---

[7] Petitioner does not claim that he would have accepted the offer made by the Government; he merely claims that he would have accepted "an" offer, which he argues, without support, would have been similar to the offer extended to co-defendant Davis.

16

This claim fails for several reasons.  First, Petitioner was well-aware of the incriminating nature of the CSLI long before the oral plea was communicated to Trial Counsel.  Key is simply incorrect that the Government disclosed the CSLI the night before trial.  While the Government turned over the demonstrative exhibit to summarize phone records and to aide in Agent Perry's testimony two days prior to Perry's testimony, Petitioner had been in possession of the underlying records and on notice regarding the existence of the CSLI since shortly after his arrest in September of 2012, when the Government commenced discovery and explained the import of the records in Court on two occasions.  Indeed, the Government emphasized the significance of the records during the November 20, 2012 bail argument. At no time during the next 16 months did Key indicate that he was interested in a pre-trial disposition of his case.  Furthermore, more than a week prior to trial, Key knew that Government intended to call Agent Perry as a witness and due to early disclosure of Perry's 3500, knew the subject matter of his testimony.

Second, further undermining Key's argument is that after Agent Perry testified, Key did not indicate that he was interested in pleading guilty.  Agent Perry testified on Thursday, March 27, 2014.  The Government began its opening summation on Friday, March 28, and continued on Monday, March 31.  Trial Counsel then closed and the Government rebutted that same day. On April 1st, the Court charged the jury and the jury returned its verdict on April 2, 2014.  At no time between March 25th, when the report was turned over to Petitioner, and the verdict, did Key indicate that he wanted to plead guilty.  Nor has Key raised this issue in the intervening years. Indeed, the first time Key has indicated that he would have been interested in a plea is in this Petition.

Third, given the record, it is dubious that earlier disclosure of GX 40 would have prompted Key to accept the Government's plea offer. There was a multitude of damming

17

evidence introduced against Key in connection with the Allen Murder Plot, including, but not limited to, toll records, text messages and photographs exchanged between and amongst the co-conspirators, LPR records, DMV records, a photograph of Canady driving a car registered to Key's wife to Brooklyn on his way to the shooting, and wire taps demonstrating the criminal relationship between Davis and Key. Given the multitude of different types of damming evidence overwhelmingly demonstrating Key's participation in the Allen Murder Plot, the Court should not credit Key's self-serving claim that had he known about the CSLI (which he did), he would have accepted a guilty plea.

Fourth and finally, Key has not even claimed that he would have accepted the plea offer extended pre-trial. Rather, he speculates that he would have accepted a plea that was similar in kind to the plea entered into between the Government and Davis. Pet. at 8. Key was not offered a similar plea. To the contrary, the oral plea offer made to Key was more punitive than the offer made to Davis, because unlike Key, Davis was not charged with any acts of violence. Key, on the other hand, was charged with two murder-for-hire plots, one of which resulted in the accidental shooting of an innocent bystander and the other which resulted in the death of Harrison, and related firearms offenses, in addition to leading the narcotics conspiracy. Given the more serious charges, multiple acts of violence, Key's significant criminal history and Key's role in the offenses, he is simply incorrect that his plea offer was or would be similar to the offer extended to Davis. Accordingly, Key's claim also fails because he has failed to demonstrate, beyond a self-serving, unsupported and conclusory claim, that he would have accepted the Government's pre-trial plea offer.

18

### C. Trial Counsel's Decision Not To File A Motion To Suppress CSLI Was Sound

#### a. Applicable Law

In addition to meeting *Strickland's* two-prong test, because this claim is based on counsel's purported failure to file a motion to suppress, Petitioner must also show that such a motion would have been meritorious. *Cf. Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). For the several reasons outlined below, this claim is meritless.

#### b. Discussion

Pursuant to Section 2703(d) of the Stored Communications Act ("SCA"), the Government obtained and introduced at trial CSLI relating to two cell phones used by Key and cellphones utilized by Canady and Babilonia in the course of the Allen Murder Plot. The judicial orders authorizing the Government to acquire the records were obtained before the Supreme Court's 2018 *Carpenter* ruling.

Key's claim that counsel was ineffective for not moving to suppress the historical cell site evidence fails both prongs of *Strickland*. First, Trial Counsel's decision not to bring a motion to suppress the CSLI was a sound strategic decision since to succeed in any pretrial motion Key would have had to establish standing, i.e., a reasonable expectation of privacy in the two cellular phones the Government alleged were utilized by Key during the Allen Murder Plot.[8] To establish standing, Key would have had to submit an affidavit admitting that he utilized those phones – that were not subscribed to in his name – and would have subsequently conceded his usage of the phones at trial if he lost his motion to suppress. Key chose not to submit an affidavit that restricted his ability to pursue a theory at trial contrary to that contained therein. Because he did not admit that he used the phones, at trial the Government had to connect each

---

[8] As to the phones used by his coconspirators, such a motion would have been fruitless since Key lacked standing to challenge that evidence.

phone to Key through different types of evidence, including Canady's phone, Babilonia's phone and probation records.  Indeed, even now Key has not filed an affidavit demonstrating his privacy interest in the cellular phones at issue.

Second, Key cannot show that counsel performed unreasonably because a motion to suppress would not have been successful.  Prior to *Carpenter*, every circuit to have considered whether an order issued under Section 2703(d) was a constitutionally acceptable basis for obtaining historical cell site data concluded that such orders were, in fact, sufficient.  *See United States v. Graham*, 824 F.3d 421, 424-26 (4th Cir. 2016) (en banc); *United States v. Carpenter*, 819 F.3d 880, 887 (6th Cir. 2016), *rev'd*, 132 S. Ct. 2206 (2018); *United States v. Davis*, 785 F.3d 498, 511-13 (11th Cir. 2015) (en banc), *cert. denied*, 136 S. Ct. 479 (2015); *In re Application of U.S. for Historical Cell Site Data*, 724 F.3d 600, 614-15 (5th Cir. 2013); *United States v. Guerrero*, 768 F.3d 351, 358-59 (5th Cir. 2014).

Notwithstanding that precedent, in June 2018, the Supreme Court held in *Carpenter* that an order issued under Section 2703(d) of the SCA was "not a permissible mechanism for accessing historical cell-site records."  138 S. Ct. at 2221.  The Court acknowledged that it had "previously held that 'a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties,'" *Carpenter*, 138 S. Ct. at 2216 (quoting *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979)), and that cell site records "implicate [that] third-party principle" because "the individual continuously reveals his location to his wireless carrier," *id*. at 2216.  It reasoned, however, that cell phone location records were a "novel" category because they contained "detailed, encyclopedic, and effortlessly compiled" information regarding an individual's physical movements.  *Id*. at 2216-17.  The Supreme Court therefore concluded that

20

the acquisition of historical cell site records was a Fourth Amendment search and that obtaining such records would generally require a warrant supported by probable cause.  *Id*. at 2221.

Prior to *Carpenter*, the Second Circuit had not directly opined on the issue of whether an individual had a reasonable expectation of privacy in historical cell site information; however, the Second Circuit had strongly indicated that no such expectation of privacy existed. Specifically, in *United States v. Pascaul*, 502 F. App'x 75, 80 (2d Cir. 2012), the Second Circuit had stated that "no governing precedent from this Court or the Supreme Court required exclusion" of historical cell site information obtained without a warrant or a showing of probable cause.  And in fact, the Second Circuit went on to note that "the general principles adopted by those courts point[] the other way"—i.e., towards the sufficiency of a Section 2703(d) order and against the idea of requiring a warrant or probable cause to obtain historical cell site data.  *Id.*

As the Supreme Court recognized in *Carpenter*, its decision—addressing the "novel circumstances" arising from the "new phenomenon" of historical cell site records—did "not fit neatly under existing precedents."  *Carpenter*, 138 S. Ct. at 2214, 2216.  To the contrary, the relevant Supreme Court precedent at the time the historical cell site information was obtained provided a clear basis for a reasonable law enforcement officer to conclude that obtaining CSLI from a customer's cellular service provider was not a search because that data had been shared with a third party.  In *United States v. Miller*, 425 U.S. 435, 443 (1976), the Supreme Court had established that the Fourth Amendment did not "prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities."  And in *Smith*, 442 U.S. 735 (1979), the Supreme Court had specifically addressed the issue in the context of records maintained by telephone companies, and held that an individual has no reasonable expectation of privacy in dialed telephone numbers conveyed to the telephone company.  Accordingly, Key

21

cannot show that counsel performed unreasonably because a motion to suppress – filed years before *Carpenter* was decided – would not have been successful.

Key also cannot meet *Strickland's* prejudice prong because of the good faith exception. Based on the above precedent, law enforcement here had every reason to believe that they were acting lawfully when they obtained historical cellular location information—which had been revealed to and collected by third-party cellular service providers—pursuant to the SCA.  The objective reasonableness of that belief, and law enforcement's good faith, is further demonstrated by the opinions of the Fourth, Fifth, Sixth, and Eleventh Circuits which, at that time, had held that a warrant was not required to obtain historical cell site information.  *See Graham*, 824 F.3d at 424-25; *Carpenter*, 819 F.3d at 887; *Davis*, 785 F.3d at 511-13; *In re App. for Historical Cell Site Data*, 724 F.3d at 614-15; *Guerrero*, 768 F.3d at 358-59.

Furthermore, law enforcement's objective good faith belief that it could acquire the historical cell site data without a warrant was not based solely on the then-existing precedent. That belief was reinforced by Congress's then-valid judgment as to proper procedure for obtaining such records, as embodied by the SCA. "Objectively reasonable good faith includes 'searches conducted in reasonable reliance on subsequently invalidated statutes.'"  *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018) (quoting *Davis*, 564 U.S. at 239).  Here, the orders obtained by the Government fully conformed to the requirements of the SCA.  *See* 18 U.S.C. § 2703.  The magistrate judges acted reasonably and lawfully in compliance with the SCA when they issued the orders authorizing the collection of this evidence, and law enforcement thus acted reasonably and in good faith when it executed those orders.  *See Chavez*, 894 F.3d at 508 (concluding that while "*Carpenter* is obviously controlling going forward," the good-faith exception applies to historical cell site information obtained using Section 2703(d) order); *Davis*,

785 F.3d at 518 n.20 (holding, pre-*Carpenter*, that good-faith exception applied where Section 2703(d) order was used to obtain cell-site records); *Graham*, 824 F.3d at 424 (same); *United States v. Pembrook*, 876 F.3d 812, 823 (10th Cir. 2017) (same).

Moreover, in the months since *Carpenter* was decided, the two circuit courts which have addressed this issue have held that the good faith exception applies to CSLI obtained via the SCA pre-*Carpenter*. *See United States v. Joyner*, --- F.3d ---, 2018 WL 3853443, at *3 (11th Cir. Aug. 14, 2018) (affirming district court's decision to deny motion to suppress cell site evidence, and noting that "the fact that the *Carpenter* Court agreed with [the defendant's] Fourth Amendment theory does not affect the applicability of the *Leon* good faith exception in this case. . . . Here, the Government complied with the requirements of the SCA in obtaining the orders to compel cell site records, and when they did so in June 2015, that warrantless procedure was, under this Court's precedent, within the bounds of the Fourth Amendment.") (citation omitted); *Chavez*, 894 F.3d at 608 (holding that *Carpenter* "can have no effect on" cases where law enforcement acted in "[o]bjectively reasonable good faith," including "searches conducted in reasonable reliance on subsequently invalidated statutes") (citation and internal quotation marks omitted).

In fact, the Second Circuit recently addressed a situation in which the Government obtained a significant volume of information (albeit via a subpoena) under the SCA in 2011, well before the *Carpenter* decision was issued. In *United States v. Zodhiates*, --- F.3d ---, 2018 WL 3977030 (2d Cir. Aug. 21, 2018), the Government had obtained, among other things, 28 months' worth of billing records, as well as subscriber and payment information. *Id.* at *2. Although the Government did not specifically request cellphone location information, the service provider sent records showing the phones' "service location," *i.e.*, the general vicinity (such as county name)

23

from which each call was made or received. *Id.* The defendant moved to suppress this evidence before trial, arguing that a warrant was required; given the state of the law at the time, the district court denied that motion. On appeal, the Second Circuit affirmed that decision, reasoning:

> During the pendency of this appeal, the Supreme Court decided *Carpenter v. United States* . . . However, [the defendant] is not entitled to have the records suppressed because, under the "good faith" exception, when the Government "act[s] with an objectively reasonable good-faith belief that their conduct is lawful," the exclusionary rule does not apply. This exception covers searches conducted in objectively reasonable reliance on appellate precedent existing at the time of the search.

*Id.* at \*4 (citations omitted). The Second Circuit went on to note that under appellate precedent prior to *Carpenter*, the third party doctrine permitted the Government to obtain such records by subpoena as opposed to by warrant. *Id.* (citing *Miller*, 425 U.S. at 443; *Smith*, 442 U.S. at 743; and *United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017)). When the appellant pointed to *United States v. Jones*, 565 U.S. 400, 404 (2012), for the proposition that a search warrant was required, the Circuit quickly disabused the appellant of that notion, stating that *Jones* was beside the point, as "[i]t was decided in 2012, after the Government's 2011 subpoena, and consequently is not relevant to our good faith analysis." *Zodhiates*, 2018 WL 3977030 at \*4.

The same logic applies here. As the above makes clear, under these circumstances—where the law enforcement agents relied in good faith on the SCA, judicial precedent, and on the magistrate judges' orders—there can be no serious question that the agents acted in good faith and in compliance with then-existing law. Thus, no exclusionary remedy is appropriate; the deterrence benefit of suppressing the CSLI obtained under the SCA is inapplicable. "[T]he harsh sanction of exclusion should not be applied to deter [this] objectively reasonable law enforcement activity." *Davis*, 131 S. Ct. at 2429 (citation and quotation marks omitted).

24

Key's claim also fails because there is no reasonable probability that the result of the proceeding would have been different even assuming a motion to suppress the CSLI was successful. There was overwhelming evidence of Key's guilt as to the Allen Murder Plot and the Attempted Murder adduced at trial, including: (1) the devastating and heavily corroborated testimony of Canady; (2) toll records of cell phones utilized by Key, Babilonia and Canady; (3) physical evidence, such as the GPS Key and Canady placed on Allen's car; (4) inculpatory text messages between Key and Canady during the course of the murder plot and after Allen was murdered; (5) EZ Pass records; (6) license plate recognition records; (7) New York State Department of Motor Vehicle records; (8) wiretap, photographic and cooperator testimony demonstrating the criminal relationship between Key and Davis; (9) Canady's bank records; (10) incriminating text messages between Key and Babilonia; and (11) CSLI of Canady and Babilonia's phones.  Given the abundance of evidence of Key's guilt, there was no prejudice since there was no reasonable probability that, absent the CSLI, the jury would have had a reasonable doubt respecting guilt as to the counts related to the Allen Murder Plot.

### D. Statements Trial Counsel Made in Opening Did Not Render His Performance Constitutionally Deficient

Key next avers that Trial Counsel was ineffective when he discussed Michelle Smalls and Babilonia in his opening statement, but ultimately did not call them as witnesses.  For the following reasons, this claim also fails.

#### a. Applicable Law

The decision as to the scope of an opening statement is generally a matter of trial strategy.  "An attorney's failure to fulfill promises made in [an] opening statement is not often a successful basis for an ineffective assistance claim." *Hampton v. Leibach*, 290 F. Supp. 2d 905, 928 (N.D. Ill. 2001), aff'd, 347 F.3d 219 (7th Cir. 2003). This is because "[t]he decision to

change strategy during trial is often forced upon defense counsel by the vagaries of the courtroom arena." *Id*. at 928. Absent a failure of preparation or abdication of the duty of representation, decisions to call or not to call witnesses remain within the discretion of defense counsel. *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) ("'counsel's decision as to whether to call specific witnesses -- even ones that might offer exculpatory evidence -- is ordinarily not viewed as a lapse in professional representation'") (internal citations and quotations omitted); *United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999) ("'[C]ounsel's decision not to call witnesses to testify about [a particular question] cannot form the basis of a meritorious ineffective assistance claim. The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.'").

"[F]ailing to present witnesses promised in an opening is not always an error of a constitutional dimension." *Williams v. Bowersox*, 340 F.3d 667, 671-72 (8th Cir. 2003) (citing cases). "The fact that trial counsel did not follow the exact letter of his opening statement does not mean that his representation fell below reasonable professional standards. Changing course from the roadmap outlined in opening statement as the trial progresses is not necessarily ineffective assistance." *United States v. Mittal*, 2000 WL 1610799, * 4, 98 Cr. 1302 (JGK) (S.D.N.Y. Oct. 27, 2000) (citing *United States v. McGill*, 11 F.3d 223, 227–28 (1st Cir. 1993); *Schlager v. Washington*, 887 F.Supp. 1019, 1026–27 (D.Ill.1995), aff'd 113 F.3d 763 (7th Cir.1997). Accordingly, several courts have held that defense counsel's broken promise that certain witnesses will testify does not warrant relief. *See, e.g., United States v. McGill*, 11 F.3d 223, 227 (1st Cir. 1993); *Ruine v. Walsh*, 2005 WL 1705147, at *20-22 (S.D.N.Y July 20, 2005) (counsel's broken promise to jury that defendant and other witness would testify was reasonable

26

in light of events at trial, including various evidentiary developments); *cf. Howard v. Davis*, 815 F.2d 1429, 1432-33 (11th Cir. 1987) (holding that a change of strategy mid-trial did not constitute ineffective assistance, even where defense counsel asserted an "insanity defense initially, knowing that he might withdraw the defense at a later time").

Because there is no rule that failure of counsel to present evidence promised in an opening statement is ineffective assistance of counsel *per se*, "the outcomes of cases that consider the effects of broken promises are . . . heavily fact-dependent and therefore varied." *Coleman v. Swarthout*, 2013 WL 2156551, *9 (E.D. Cal. May 17, 2013); *United States v. McGill,* 11 F.3d 223, 227 (1st Cir. 1993) ("Although a failure to produce a promised witness may under some circumstances be deemed ineffective assistance . . ., the determination of inefficacy is necessarily fact-based."). Consequently, this Court should consider Trial Counsel's purported failure to deliver promised testimony to the jury in light of all the circumstances.

### b. Facts

Trial Counsel spent the majority of his opening statement attacking the credibility of the cooperating witnesses. (Tr. 24-47.) In addition to rigorously attacking the credibility and motives of the cooperating witnesses, Trial Counsel also argued that when Key was released from prison after serving a lengthy sentence, he had legitimate employment, which included promoting parties. (Tr. 44-46.) Trial Counsel explained that Smalls – a party promoter – would testify that together they promoted about 7 or 8 parties and that Key made approximately $150,000 in connection with the party promoting. (Tr. 45-46).) Trial Counsel chose to not call Smalls as a witness, however, despite serving Smalls with a subpoena because Smalls became uncooperative.

Nevertheless, Trial Counsel readily proved that Key promoted parties for profit, and did so on occasion with Smalls.  For example, through the cross-examination of cooperating witness Aaron Williams, Trial Counsel established that Key had promoted parties with Smalls.  (Tr. 1216-20.)  Williams's also testified that Key and others were involved with the "#1Boiz," an amateur rap group that posted videos on YouTube.  (Tr. 1220.)  On re-direct, Williams also noted that members of the #1Boiz (including Davis) promoted parties and that Williams himself promoted parties, all the while simultaneously dealing drugs.  (Tr. 1256.)  Cooperating witness Melvin Tarleton also testified that the #1Boiz promoted parties for profit.  (Tr. 1415-17.) The Government also introduced as an exhibit a picture of a diamond encrusted pendant Key owned that said "#1 Boiz Promote Your Party Promote Your Funeral." Canady also testified that Petitioner told Canady that Key was investing in a music business.  (Tr. 1870).

In his opening statement, Trial Counsel also indicated that he believed the evidence would show that a man named "Tracien Austin" was responsible for Allen's ultimate murder, a crime not charged nor at issue in Key's trial.  (Tr. 40-41.)  Trial Counsel stated that the evidence would show that Austin owed Babilonia money.  (Tr. 41.)  Trial Counsel also explained to the jury that Babilonia told many people that Allen was abusive and that after Allen's murder, Austin texted Babilonia "let's leave what's in the grave in the grave because I took care of your biggest headache."[9]  (Tr. 41.)  The logical inference, Trial Counsel argued, was that Austin murdered Allen to satisfy the purported debt.  (*Id.*)

Following his opening statement, Trial Counsel informed the Court that Babilonia ceased cooperating and that he was unable to produce the supposed text message.  Trial Counsel then asked the Court immunize Babilonia or, in the alternative, permit a defense investigator to testify

---

[9] The Government has not seen this purported text message and apparently neither had Trial Counsel. (Tr. 1442-47.)

pursuant to Federal Rule of Evidence 807, the residual hearsay exception, regarding statements

Babilonia made during a prison interview. (Tr. 1442-48.) The Government opposed, noting that

the testimony in question was hearsay and that it should be excluded under Rule 403. In

response, this Court ruled that it had no authority to immunize a witness *sua sponte* and denied

the defendant's request to elicit the testimony through his investigator. Petitioner does not

challenge these rulings.

### c. Discussion

Key argues that Trial Counsel was ineffective "by claiming in his opening statement that

important evidence would be produced by two witnesses and then" failed to call those witnesses.

Pet. at 19. First, the evidence that Trial Counsel intended to offer through Smalls – that Key

earned money promoting parties – was introduced at trial. Trial Counsel elicited these largely

uncontested facts through three cooperating witnesses (Williams, Tarleton and Canady). Trial

Counsel also questioned Key's jeweler about a diamond pendant Key commissioned that

referenced Key's party promoting business. Trial Counsel also introduced a picture of Key and

Smalls, and elicited the fact that Smalls was a party producer. In turn, Trial Counsel argued to

the jury in closing that Key was in the music business and earned money as party promoter. (Tr.

1848-1850, 1871.) In other words, Key is simply wrong that this evidence was not introduced at

trial – it merely was elicited from witnesses other than Smalls.

Furthermore, the strategic decision not to call Smalls, particularly after Smalls stopped

responding to his inquiries, was sound, especially since Trial Counsel was able to elicit the same

information from multiple other witnesses. *See United States v. Crawford*, 680 F.Supp. 2d 1177,

1197 (E.D. Cal. 2009) ("[W] here the testimony to be provided would not be significant or was

elicited through other means, courts may defer to counsel's reasonable decision to change

course."); *cf. United States v. McGill*, 11 F.3d 223, 228 (1st Cir. 1993) (finding the decision not to call an easily impeachable witness, a firearms expert, a reasonable tactical decision when the testimony sought from the witness had already been introduced through another expert). Therefore, Key cannot meet *Strickland's* first prong.

Likewise, Key fails to meet *Strickland's* second prong, because as multiple witnesses testified, an individual can simultaneously promote parties and deal drugs. To that end, the Government did not contest that Petitioner produced parties; in fact, it was the Government's own witnesses who testified as such. The Government merely argued to the jury – and the jury accepted – that Key was a major narcotics dealer. Furthermore, the evidence of Key's drug dealing was overwhelming and included, among other types of evidence, the testimony of multiple cooperating witnesses, wiretaps, surveillance photos, evidence from a car stop, evidence of unexplained wealth exceeding that of a party promoter, and evidence from searches. Therefore, under these facts, Petitioner cannot demonstrate prejudice.

Petitioner also faults Trial Counsel for promising in his opening statement that the jury would learn about evidence demonstrating that Austin killed Allen. Pet. at 21. This argument also fails for several reasons. First, regarding Allen's abuse of Babilonia, this evidence was elicited through Canady and was not contested by either party. Second, once this Court ruled that it would not immunize Babilonia, effectively forestalling her testimony since she asserted her Fifth Amendment right against self-incrimination, or introduce her statements through a defense investigator, it was sound strategy not to focus on Babilonia and Austin since Allen's actual murder was not an issue in the case.[10] In other words, even if Austin ultimately killed

---

[10] The Government introduced evidence of Allen's murder to corroborate text messages between Key and Canady regarding the murder and to give context to the murder plot. Neither Canady, nor Key, were charged with killing Allen.

Allen for Babilonia, there was overwhelming evidence of Key's leadership of the charged murder-for-hire plot targeting Allen. Accordingly, Key cannot meet *Strickland's* first prong.

But assuming, *arguendo*, that Trial Counsel's statements to the jury regarding Austin and the purported post-murder text message meets *Strickland's* first prong, Trial Counsel's performance did not prejudice Key.  First, the time that elapsed between opening statement, March 18, 2014, and when deliberations commenced, April 1, 2014, was significant. During the intervening weeks, the Government called approximately 25 witnesses, including: (i) six cooperating witnesses; (ii) multiple current and former law enforcement officers; (iii) Key's federal probation officer; and (iv) Key's jeweler.  Given the lapse of time between the opening statement and commencement of deliberations, "[a]ny danger that the jury had been 'primed' by [Trial Counsel's] opening to hear a different version of the incident' but then disappointed, or led to believe that defense witnesses could not 'live up to their billing' in a manner they 'would not forget,' was minimized and dissipated by the significant temporal gap . . . between the opening statements and the close of evidence."  *Crawford*, 680 F. Supp. 2d at 1201.

Furthermore, the purported evidence, including the text message, is not exculpatory, as it was in other cases where federal courts found trial counsel's performance fell below objective reasonable standards and prejudice.  Here, the text message at best leads to the inference that Austin may have been involved in the December 4, 2011 murder of Allen.  Key was not charged with that crime and the Government never argued that Key was involved in that murder.  Indeed, as noted above, the only reason Allen's murder was briefly mentioned at trial was to give context to, and corroborate the devastating testimony of, Canady.  "It may well be true that little is more damaging than to fail to produce important evidence that had been promised in an opening.  But, where the evidence is not important, and in fact, may be irrelevant, prejudice is not a given."

31

*United States v. Causey*, 10 Cr. 88, 2016 WL 3254990, *4 (June 13, 2006 N.D. Indiana) (internal

citation omitted).  Here there was overwhelming evidence of Key's guilt as to the Allen Murder

Plot, including, but not limited to, the testimony of Canady, toll records, cell sites, text messages,

bank records, license plate recognition records, and photographs.  On this record, Key cannot

meet his burden by "a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

### E.  Trial Counsel Did Not Deprive Defendant of his Right to Testify

#### a.  Applicable Law

It is well established that criminal defendants have a constitutional right to testify on their

own behalf. *See Rock v. Arkansas*, 483 U.S. 44, 49-53 (1987). The Second Circuit has explained

that a defendant's right to testify is "waivable only by the defendant himself regardless of tactical

considerations." *Brown v. Artuz*, 1997 U.S. App. LEXIS 34018, at *15 (2d Cir. 1997). The

"decision whether to testify belongs to the defendant and may not be made for him by defense

counsel." *Id.*, at *16. Consequently, defense attorneys have a "professional responsibility of

ensuring the defendant's right to testify is protected and that any waiver of that right is knowing

and voluntary." *Id.*, at *24. A petitioner who wishes to pursue a claim of ineffective assistance of

counsel on the basis that his counsel interfered with his right to testify "must show that: (1)

'counsel [] failed to inform the defendant that the ultimate right to decide whether or not to

testify belongs to the defendant,' and (2) 'the preponderance of credible evidence indicates that

the defendant was not independently aware of this right.'" *United States v. DeFeo*, 1996 U.S.

Dist. LEXIS 22523, at *51 (S.D.N.Y. Dec. 27, 1996).

Even if an attorney provided constitutionally deficient assistance by failing to advise a

defendant of his right to testify, the defendant must also prove prejudice.  In order to make that

showing, the defendant must demonstrate that his "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (quoting *Strickland*, 466 U.S. at 687). Accordingly, Petitioner must demonstrate a reasonable probability that his "proposed testimony would have altered the outcome of the trial." *Rega*, 263 F.3d at 21.

### b. Facts

Prior to the close of the Government's case, the Court queried Key about his right to testify and his decision not to take the stand. Specifically, the following exchange occurred:

> THE COURT: I do wish to ask your client questions to establish that he understands that the decision of whether or not to testify is for him and not for you.
>
> MR. MCMAHON: Yes.
>
> THE COURT: So, if you want some time to talk to him, you can.
>
> MR. MCMAHON: I talked to him about it already.
>
> \*       \*       \*
>
> THE COURT: Mr. Key, you decided not to testify in this case. Is that true?
>
> THE DEFENDANT: That is correct, your Honor.
>
> THE COURT: What's important for you to understand, and I need to know that you understand this, is that the decision of the defendant not to testify is a decision that the defendant is to make. There are certain decisions that lawyers make: What witnesses to call, what motions to make, things of that nature. But the decision of whether a defendant is going to testify or not is a decision for the defendant to make. I want you to talk to Mr. McMahon about it. Presumably you already have. Correct?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: It's always good to listen to your lawyer. You don't have to listen to your lawyer, but it's important that you get his views, and I don't want to know what they are. What's important for you to understand is that ultimately it's your decision, not Mr. McMahon's, as to whether or not you're going to testify. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: What is your decision, sir?

THE WITNESS: My decision is not to testify, your Honor.

(Tr. 1727-29.)

### c.  Discussion

Key claims that Trial Counsel was ineffective when he advised Key that Babilonia and Smalls "would testify because Petitioner prepared his own testimony to coincide with their testimony, and counsel's ineffectiveness deprived Petitioner from testifying on his own behalf." Pet. at 28.[11]  This claim fails for several reasons.  First, the record is clear that Petitioner was well-aware of his right to testify and waived that right.  For this reason alone Key's ineffective assistance of counsel claim fails.  Key also does not explain how Trial Counsel's conduct prevented Key from exercising his right to testify – he only offers the conclusory assertion that it did.

Moreover, Key's late and self-serving claime that he wanted to testify does not have the ring of truth.  Key was on notice that Smalls was uncooperative with his defense team by at least March 25, 2014.  (Tr. 1083-96.)  Likewise, Key was aware that Babilonia would not testify by at least March 27, when the Court refused to grant her immunity or permit a defense investigator to summarize a jailhouse interview he conducted.  When this Court queried Key as to his decision not to testify, Key was well-aware that Smalls and Babilonia would not testify.  Yet, when questioned by the Court, Key did not indicate that he wanted to testify.  To the contrary, Petitioner clearly stated that he understood that the decision to testify belonged only to him and

---

[11] Key does not and cannot claim that Trial Counsel failed to inform Key about his right to testify or that Key was somehow unaware of this right.

that he chose not to testify.  It is only now that he is making the self-serving claim that he wanted to testify and the Court should not credit it.

Finally, Key's claim fails under the second prong of *Strickland*.  Key does not explain how his testimony would have overcome the mountain of evidence establishing his guilt.  As noted above, it was not in serious dispute that Key promoted parties or that an individual can promote parties and also commit crimes.  Also as noted above, Key was not charged with the murder of Allen and the evidence relating to Key's guilt vis-à-vis the conspiracy to murder Allen was overwhelming.  Therefore, Key also fails the prejudice prong.

### F.  Trial Counsel Was Effective During Sentencing

Next, Petitioner claims that Trial Counsel was ineffective because at sentencing he did not object to the Court "sentencing Petitioner to mandatory LIFE without submitting the drug-quantity issue to the jury for determination under the beyond-a-reasonable-doubt standard." Pet. at 30.[12]  First, Petitioner is wrong because Trial Counsel did argue, albeit unsuccessfully, in both Petitioner's sentencing submission and orally, that sentencing based on PFIs that were not submitted to the jury did not survive *Alleyne*. *See* Def. Sent. Mem.; March 24, 2015 Sentencing Letter, Dkt. No. 574.

Second, this claim also fails because, as this Court held, Trial Counsel was incorrect: *Allyne* does not apply to prior convictions.  Indeed, the Second Circuit has rejected this very claim.  In *United States v. Gabriel*, the Second Circuit rejected the defendant's argument that the district court committed error and engaged in impermissible judicial fact-finding when it

---

[12] In connection with this claim, the Government is unclear about exactly where Key finds fault. Although Key discusses drug quantities, Count One resulted in a mandatory life sentence because of the two PFIs, which were not submitted to the jury.  Accordingly, this section addresses the propriety of sentencing Key based on the PFIs.

increased his statutory mandatory minimum sentence because the Government filed a PFI.  599

Fed. App'x 407, 408-09 (2d Cir. 2015).   Specifically, the Second Circuit noted that

> "[W]here a statute provides for an enhanced penalty based on a defendant's prior convictions, the fact of those convictions is a sentencing factor to be determined by the court rather than a jury, and—as far as the Constitution is concerned—sentencing factors can be proved to a judge at sentencing by a preponderance of the evidence." *United States v. Espinal*, 634 F.3d at 664 (internal quotation marks omitted); *see generally Almendarez–Torres v. United States*, 523 U.S. 224, 239–47, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (holding that, where statute provides enhanced penalty based on prior conviction, fact of conviction is sentencing factor to be determined by court rather than by jury). *Alleyne v. United States*, —— U.S. –——, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013) is not to the contrary, because the Supreme Court there declined to revisit *Almendarez–Torres*. *See id*. at 2160 n. 1; accord *United States v. Dantzler*, 771 F.3d 137, 143 (2d Cir.2014) (recognizing continued validity of Almendarez–Torres following Alleyne).

*Id*; *see also United States v. Del Rosario*, 561 Fed. App'x 68 (2d Cir. 2014).  And here, as in

*Gabriel*, Petitioner has not disputed the facts of his convictions.

> As noted by another district court judge in the Southern District of New York,

> In *Almendarez–Torres v. United States*, 523 U.S. 224 (1998), the Supreme Court held that the fact of a prior felony conviction which substantially increases the possible punishment for a crime need not be treated as an element of that crime, and therefore need not be charged in the indictment or found beyond a reasonable doubt by a jury. Neither *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which *Alleyne* affirms and extends, nor *Alleyne* itself, disturbs this rule in the context of a prior felony conviction. See *Apprendi*, 530 U.S. at 490 ("Other than the fact of a prior conviction...."); *Alleyne*, 133 S.Ct. at 2160 n.1 (declining to revisit *Almendarez–Torres's* "narrow exception"). *See also United States v. Del Rosario*, 561 Fed.Appx. 68, 69 (2d Cir.2014) (summary order) (upholding district court's refusal to present prior felony information to jury and the resulting enhancement of mandatory minimum sentence).

*Francis v. United States*, 06 Cr. 0080 (NRB), 2016 WL 2865422, *9 (S.D.N.Y. May 13, 2016).

Accordingly, the Court should also reject this basis for Petitioner's ineffective assistance of

counsel claim.

36

## PETITIONER'S REMAINING CLAIMS ARE MERITLESS

### I.        Procedural Default Doctrine

"Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." *Bousley v. United States*, 523 U.S. 614, 621 (1998) (quotation marks and citation omitted); *United States v. Frady*, 456 U.S. 152, 165 (1982) ("[W]e have long and consistently affirmed that a collateral challenge may not do service for an appeal."); *Zhang v. United States*, 506 F.3d 162, 166 (2d Cir. 2007) ("In general, a claim may not be presented in a habeas petition where the petitioner failed to properly raise the claim on direct review."). Society's interest in repose of criminal judgments animates these procedural rules and compels their vigorous enforcement. *See, e.g., Harrington v. Richter*, 562 U.S. 86, 103 (2011); *McCleskey v. Zant*, 499 U.S. 467, 490-91 (1991). As a result, defendants seeking post-conviction relief cannot use a Section 2255 petition to litigate questions that could have been raised on direct appeal but were not. *See Rosario v. United States*, 164 F.3d 729, 731 (2d Cir. 1999).

These rules apply even when there has been a change in the substantive criminal law that has been announced after a petitioner's conviction has become final and that lends legal support to the petitioner's legal claim. *See, e.g., Bousley v. United States*, 523 U.S. at 617-624 (concluding that petitioner had procedurally defaulted claim based on new rule of substantive criminal law announced after his conviction became final); *United States v. Frady*, 456 U.S. at 157-58, 167-68 (same); *United States v. Thorn*, 659 F.3d at 231-33 (same); *Fordham v. United States*, 706 F.3d 1345, 1349-51 (11th Cir. 2013) (same); *Jennings v. United States*, 696 F.3d 759, 764 (8th Cir. 2012) (same); *see also Harrington v. United States*, 689 F.3d at 128-29 (applying traditional procedural default rules to a claim that "new substantive rules of federal criminal law" that post-dated petitioner's conviction becoming final). When such a change in substantive law

37

occurs, and a petitioner has procedurally defaulted the claim by failing to raise it on direct appeal, a court may reach the merits only if the petitioner "can first demonstrate either 'cause' and 'actual prejudice,' or that he is 'actually innocent.'" *Bousley*, 523 U.S. at 622 (quoting *Murray v. Carrier*, 477 U.S. 478, 485, 496 (1986); *see also Rosario v. United States*, 164 F.3d at 732 (defendant must demonstrate "either (1) 'cause for failing to raise the issue, and prejudice resulting therefrom,' . . . or (2) 'actual innocence'" (citations omitted)).

### a. Cause and Prejudice

The Supreme Court has made clear that "cause" is measured by a stringent standard of diligence. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("Cause" is "something external to the petitioner" which "cannot be fairly attributed to him"). "Cause" to excuse a procedural default may exist where a claim "is so novel that its legal basis [was] not reasonably available to counsel." *Reed v. Ross*, 468 U.S. 1, 16 (1984).  A claim is "reasonably available," however, if at the time of the default, it was being raised by litigants and addressed by the courts. *See Bousley*, 523 U.S. at 622-23 (claim not "novel" where judicial decisions in the reporters show that the legal basis for the claim was "reasonably available").

Critically, the Supreme Court has long made clear that a petitioner cannot demonstrate "cause" for failing to raise a claim simply because doing so would have been futile. It matters not that the claim may have been doomed under prevailing law; even when the law is against a contention, a litigant must make the argument to preserve it. As the Supreme Court stated in *Bousley*: "[F]utility cannot constitute cause if it means simply that a claim was unacceptable to the particular court at that particular time." 523 U.S at 623 (*quoting Engle v. Isaac*, 456 U.S. 107, 130 n.35 (1982)).  Furthermore, the mere fact that the petitioner's claim rests on a rule of substantive criminal law not announced until after his conviction became final does not establish

38

that "the factual or legal basis for a claim was not reasonably available" on direct review. *Thorn*, 659 F.3d at 233; *see also id*. ("The futility test to excuse a default is strict: 'the question is not whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the claim was "available" at all.'") (quoting *Smith v. Murray*, 477 U.S. 527, 537 (1986)).

In addition to showing "cause," a petitioner seeking post-conviction relief despite his procedural default is also required to demonstrate "prejudice" that ensues from the default. The burden is substantial.

### b. "Actual Innocence"

If a petitioner cannot demonstrate "cause" for his procedural default, he can attempt to obtain review for his claim by establishing "that a fundamental miscarriage of justice would result from a failure to entertain the claim." *McCleskey v. Zant*, 499 U.S. at 494-95. The Supreme Court has repeatedly emphasized that by the term "fundamental miscarriage of justice," it means the "actual innocence" of the petitioner. *See Herrera v. Collins*, 506 U.S. 390, 404 (1993) (referring to rule requiring "proper showing of actual innocence" as the "fundamental miscarriage of justice exception" and explaining that the purpose of the exception is "to see that federal constitutional errors do not result in the incarceration of innocent persons"). Furthermore, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)). This extremely narrow test is satisfied only if the petitioner can demonstrate that his acts "have been ruled not to constitute criminal conduct." *Underwood v. United States*, 166 F.3d 84, 88 (2d Cir. 1999); *see also Reyes-Requena v. United States*, 243 F.3d 893, 904 (5th Cir. 2001) (petitioner must establish that he or she "may have been convicted of a nonexistent offense").

39

## II.    Petitioner's *Johnson* Claim is Meritless

### a.  Applicable Law

A defendant is guilty of violating Section 924(c) if he used or carried a firearm during and in relation to, or possessed a firearm in furtherance of, a "crime of violence" or "drug trafficking crime."  18 U.S.C. § 924(c)(1)(A).  A "crime of violence" is defined as a felony that (1) "has as an element the use, attempted use, or threatened use of physical force against the person or property of another" (the "force clause") or (2) "by its nature . . . involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" (the "risk-of-force clause").  *Id*. § 924(c)(3)(A), (B).

Recent Supreme Court decisions have invalidated as unconstitutionally vague language similar to that found in Section 924(c)'s risk-of-force clause. First, in *Johnson v. United States*, 135 S. Ct. 2551 (2015), the Court declared unconstitutional the risk-of-force clause contained in the definition of "violent felony" supplied by the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B)(ii). *Johnson*, 135 S. Ct. at 2257-60. Then, in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), the Court extended Johnson's reasoning to 18 U.S.C. § 16(b), finding that the risk-of-force clause in that statute's definition of "crime of violence" was likewise infirm.  See *Dimaya*, 138 S. Ct. at 1215.

However, in neither *Johnson* nor *Dimaya* did the Court suggest that the language of the force clause appearing in the statute under consideration—ACCA or Section 16, respectively— was suspect. Moreover, and in any event, the Second Circuit recently concluded that Section 924(c)'s risk-of-force clause does not share the same infirmity as the risk-of-force clauses considered in *Johnson* and *Dimaya*.  *See United States v. Barrett*, 903 F.3d 166, 175-76, 178 (2d Cir. 2018).  Specifically, Section 924(c)(3)(B) can be applied in a "case-specific" way that

"avoids both the Sixth Amendment right-to-trial and due process vagueness concerns" that caused the Supreme Court to invalidate the risk-of-force clauses at issue in *Johnson* and *Dimaya*. *Id*. at 178. That is, the clause "can be applied to a defendant's case-specific conduct, with a jury making the requisite findings about the nature of the predicate offense and the attending risk of physical force being used in its commission." *Id*. Where—as in most cases that pre-date *Barrett*—the jury was not actually asked to decide the risk-of-force question, that omission is reviewed under the appropriate standard to determine its effect on the outcome of the case. *See id*. at 184 (where *Dimaya* was decided during pendency of direct appeal, applying harmless error standard).

### b.   Discussion

Counts Three and Four charged Petitioner with conspiracy to commit murder-for-hire and aiding and abetting attempted murder-for-hire, in violation of Title 18, United States Code, Sections 1958 and 2. Count Four noted that Capriata shot and caused injury to Victim-2. Count Five charged Key with aiding and abetting the discharge of a firearm in connection with Counts Three and Four, in violation of Sections 924(c)(1)(A)(iii), (c)(1)(C)(i) and 2. In this Petition, for the first time, Key claims that his conviction on Count Five must be vacated because the underlying conspiracy (Count Three) fails to qualify as a crime of violence under *Johnson*.[13] Pet. at 12-15. This claim fails for several reasons.

First, Key procedurally defaulted this claim, and he does not even attempt address cause, prejudice or actual innocence. Nor could Key since he cannot meet any of these prongs. When Key filed his appeal on January 1, 2016, *Johnson* had already been decided; Petitioner has not

---

[13] Key mistakenly states that he was charged with racketeering conspiracy. Construing this *pro se* Petition liberally, the Government will respond to the charges of conviction contained in the Indictment, i.e., murder-for-hire conspiracy and attempted murder-for-hire resulting in injury.

41

articulated a reason why this Court should excuse his failure to raise this issue until this late date. And because, as outlined above, evidence of Key's guilt as to Counts Three through Five was overwhelming, he cannot establish prejudice, let alone actual innocence.

Second, assuming Petitioner could overcome the procedural bar, this claim still fails. Attempted murder-for-hire is a crime of violence under both the force clause and the risk of force clause of Section 924(c). *See United States v. Galati*, 844 F.3d 152, 155 (3d Cir. 2016) (rejecting defendant's *Johnson* argument and holding that a violation of Section 1958 that results in personal injury and during which a firearm is discharged is a crime of violence under the force clause); *Pena v. United States*, 192 F.Supp. 3d 483, 495 (S.D.N.Y. 2016) (rejecting the petitioner's *Johnson* claim and finding that "murder for hire falls squarely within the meaning of the term 'crime of violence' by virtue of the elements of the offense) citing *See United States v. Jones*, 129 F.3d 718 (2d Cir. 1997) (affirming defendant's conviction on all counts including conspiring to commit murder for hire and for use of a firearm in the commission of a crime of violence in violation of 18 U.S.C. Sections 1958 and 924(c));*United States v. Gomez*, 210 F.Supp. 2d 465 (S.D.N.Y. 2002)).[14]  Key does not cite to any case law to the contrary.

---

[14] If the Court determines that murder-for-hire conspiracy falls only under the risk of force clause, Petitioner's claim still fails. The *Barrett* Court held that a failure to instruct the jury to answer the risk-of-force question, in a case implicating Section 924(c)(3)(B)'s risk-of-force clause, is reviewed on direct appeal under the familiar standard applicable to claimed instructional error. *See Barrett*, 903 F.3d at 184.  That is, "[t]he relevant inquiry 'is whether it appears beyond a reasonable doubt" that the omission "did not contribute to the verdict obtained.'" *Id*. (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)).  The standard applicable to claims of instructional error on collateral review is somewhat more stringent, however.  The question in this context "is whether the . . . error 'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also, e.g., Underwood v. United States*, 166 F.3d 84, 87 (2d Cir. 1999) ("In *Brecht* . . . , the Supreme Court ruled that constitutional errors will not be corrected through a writ of habeas corpus unless they have had a 'substantial and injurious effect.'"). On these facts—where Key procured a murder-for-hire and provided the firearm for the shooting—the omission did not contribute to his conviction on Count Five.  In other words, any purported error was harmless.

42

If a substantive offense (Count Four) is a crime of violence, then a conspiracy to commit that crime (Count Three), "by its very nature," raises a "substantial risk" of violent force and thus qualifies as a "crime of violence" under the risk-of-force clause in Section 924(c)(3)(B). *United States v. Elder*, 88 F.3d 127, 129 (2d Cir. 1996); *see also Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004) ("look to the elements and the nature of the offense of conviction . . . ."). Because Count Four (attempted murder-for-hire) is a crime of violence, Count Three (conspiracy to commit murder-for-hire) qualifies as a crime of violence. "Conspiracy to commit crimes of violence is a sufficient predicate crime of violence for the purposes of 18 U.S.C. § 924(c)." *See, e.g., United States v. Persico,* 164 F.3d 796, 802 (2d Cir. 1999); *Elder*, 88 F.3d at 129. "Conspiracies that may properly be deemed crimes of violence include those whose objectives are violent crimes or those whose members intend to use violent methods to achieve the conspiracy's goals." As the Second Circuit has recognized,

> [a] conspiracy, by its very nature, is a collective criminal effort where a common goal unites two or more criminals. Such a meeting of the minds enhances the likelihood that the planned crime will be carried out . . . . Thus, when a conspiracy exists to commit a crime of violence, such as kidnapping, the conspiracy itself poses a 'substantial risk' of violence, which qualifies it under Section 924(c)(1) and Section 924(c)(3)(B) as a crime of violence.

*Elder*, 88 F.3d at 129. Accordingly, this claim also fails.

### III. Petitioner Was Properly Sentenced to Life Based On His Prior Drug Convictions

#### a. Facts

Prior to the commencement of trial the Government filed two PFIs, pursuant to Title 21, United States Code, Section 851, subjecting Key to the enhanced penalties of Title 21, United States Code, Section 841(b)(1)(A). The first filed PFI was predicated upon a 1999 federal narcotics conspiracy conviction, which Key does not challenge. *See* Dkt. No. 313. Then on

43

March 6, 2014, the Government filed a second PFI predicated upon Key's 1995 convictions in New York State court of: (1) criminal sale of a controlled substance 3rd degree (cocaine), in violation of Penal Law 220.39(1); (2) criminal sale of a controlled substance 3rd degree (heroin), in violation of Penal Law 220.39(1); and (3) criminal sale of a controlled substance 3rd degree (cocaine), in violation of Penal Law 220.39(1) (hereinafter the "Second PFI"). *See* Dkt. No. 355.

Because Key was convicted of the narcotics conspiracy count and the jury determined that the quantity of controlled substances that were the object of the conspiracy involved 280 grams and more of crack cocaine and five kilograms and more of powder cocaine, Count One carried a mandatory sentence of life imprisonment. At sentencing, Key objected to the filing of the Second PFI because Key was adjudicated a youthful offender and on due process grounds. *See* March 3, 2015 Letter, Dkt. No. 566. The Court rejected these arguments, and sentenced Key to mandatory life on Count One. Kay abandoned these arguments on appeal.

### b. Discussion

For the following reasons, this claim fails. First, Petitioner is procedurally barred from raising this argument for the first time in this Petition. Key filed his appellate Reply Brief on June 10, 2016, thirteen days before the Supreme Court decided *Mathis*. Accordingly, during the pendency of Key's appeal, *Mathis* was under consideration by the Supreme Court. Yet at no time before oral argument or before the Second Circuit upheld Key's conviction in 2017 did Key raise this issue. Nor does Key attempt to address cause, prejudice or actual innocence. Accordingly, he is procedurally barred from making this claim.[15]

---

[15] The Second Circuit has also held that the *Mathis* Court did not announce a new rule of constitutional law made retroactive to cases on collateral review that was previously unavailable. *See Washington v. United States*, 868 F.3d 64, 64-65 (2d Cir. 2017).

Second, any purported error was harmless.  As outlined in the Government's sentencing submission and made clear throughout trial, Key was the leader of a sprawling and violent drug conspiracy, and was found guilty of two separate murder-for-hire conspiracies, one of which resulted in the shooting of an innocent bystander and the other of which resulted in the death of Harrison.  Key also had an extensive and violent criminal history, including several state and federal narcotics convictions and convictions for manslaughter and firearms offenses.  At sentencing, the District Court seized on these facts, noting that Key was a "completely amoral person." (Sent. Tr. 20.)  The Court found the total offense level to be 50 and that Key was in criminal history category VI, which results in a Guideline of life imprisonment.[16]  While this Court noted that it was sentencing Key pursuant to the mandatory minimum as to Count One, it explained that the sentence imposed, life plus thirty years, was "appropriate[] given the extraordinary seriousness of the offenses and the need for punishment and general deterrence." (Sent. Tr. 35.)  The Court went on to note that it considered all of the 3553(a) factors, and that the Court agreed with the mandatory life sentence as to Count One because the "punishment for these crimes is necessary, and out of serious concern for incapacitation. (Sent. Tr. 36.)  Indeed, this Court noted that defendant needed to be taken out of society to prevent him from committing other crimes in society. (*Id*.)  The Court also noted that Key used his talents in deadly, dangerous and illegal ways. (*Id*.)  In other words, while this Court acknowledged that Count One carried a mandatory sentence of life, the Court agreed that this was the appropriate sentence.

Therefore, even assuming error, this Court may affirm on harmlessness alone.  *Cf. United States v. Deandrade*, 600 F.3d 115, 120 (2d Cir. 2010) (any error in enhancing defendant's

---

[16] Key does not challenge these findings.  Were the Court to find that the Second PFI were infirm – which it should not – Key's Guidelines as to Count One would remain life and the mandatory minimum would be 20 years as to the narcotics conspiracy.  Key would also remain subject to the mandatory consecutive 30 years on the firearms counts.

45

mandatory minimum sentence under § 851 was harmless beyond a reasonable doubt when the court stated that it had imposed sentence "without regard to the mandatory minimum"); *United States v. Dewar*, 375 F. App'x 90, 94 (2d Cir. 2010) (unpublished) (cert. granted and judgment vacated on other grounds) (holding any error in applying § 851 enhancement was harmless, because the court stated explicitly that it would impose a 20-year sentence "regardless of what the mandatory minimum is").

Third, if the Court were to reach the merits, the sentence should be affirmed because Key's 1995 Conviction is a "felony drug offense" within the meaning Title 21, United States Code, Section 851. Key argues that the Supreme Court's ruling in *Mathis v. United States*, 135 S.Ct. 2234 (2016) and the Second Circuit's ruling in *Harbin v. Sessions*, 860 F.3d 58 (2d Cir. 2017) compel otherwise, because New York Penal Law criminalizes "certain substances that are not listed in the Federal Controlled Substance Act," such as chorionic gonadotropin. Pet. at 15-16. Key's argument fails because he is wrong on the law and on the facts.

As an initial point, unlike the definition of a "controlled substance" in the immigration statute at issue in *Harbin*, the definition of "felony drug offense" in Section 841(b)(1)(A) does not refer to the specific drug schedules of the Controlled Substances Act ("CSA"). Rather, Section 802(44) defines "felony drug offense" more broadly, to include "an offense that is punishable by imprisonment for more than one year under any law . . . of a State . . . that prohibits or restricts conduct relating to narcotic drugs . . . ." Here, of course, a conviction for CSCS 3rd degree carries a potential punishment of more than a year in prison and is therefore a felony drug offense. *See Williams v. United States*, 03 Cr. 795 (SJF), 2017 WL 2389580, *6 (June 1, 2017, E.D.N.Y.) (dismissing habeas petition and holding that "[b]y the plain terms of the relevant statutes, someone who has been previously convicted of violating § 220.39(1) of the

46

New York Penal Law is someone who has "a prior conviction for a felony drug offense" under §

851. There is no need to employ the "modified categorical approach" at issue in *Descamps*, or

any other approach other than reading the relevant statutes according to their plain terms.").

Even if in 1995 New York Penal Law criminalized a narcotic that fell outside the federal

schedules of the CSA – which Key does not site to – any conviction under the statute would still

qualify as a felony drug offense under the broad definition of Section 802(44).

But even if the Court were to examine Key's 1995 Conviction under Key's premise that

New York Penal Law Section 220.39(1) is overbroad and indivisible under the categorical

approach, his claim still fails.[17] Under New York Penal Law Section 230.39(1), a "person is

guilty of criminal sale of a controlled substance in the third degree when he knowingly and

unlawfully sells . . . a narcotic drug."  Pursuant to New York Penal Law Section 220.7, a narcotic

drug "means any controlled substance listed in schedule I(b), I(c), II(b) or II(c), other than

methadone."  New York's schedules of controlled substances is contained in Article 33 of the

Public Health Law, Section 3306.  A comparison of the federal CSA and Section 3306 reveals

that unlike CSCS 5th that was at issue in *Harbin*, CSCS in the 3rd degree is not overbroad as

compared to the CSA.[18] In other words, because Section 220.39(1) only punishes conduct that is

---

[17] It is far from clear that CSCS 3rd degree is subject to the categorical approach – as opposed to the modified categorical approach, under which Key's claim would also fail since Key's certificates of disposition note that the substances at issue were cocaine and heroin. Furthermore, it is far from clear that Section 851 is even subject to a categorical or modified categorical analysis. *See United States v. Torres*, 711 Fed. App'x 829, 833 n.2 (9th Cir. 2017) (noting that the "that the categorical approach may be a poor fit for sentencing determinations under 21 U.S.C. § 851, which sets up a statutory, trial-like procedure for determining whether the defendant has a prior conviction for a 'felony drug offense[]'").

[18] The federal schedule listed "opium fluid" while the NYS schedule listed "opium fluid extracts" as controlled substances.  This is not a material difference and should not alter the Court's conclusion that the state and federal schedules are on all four corners.

also criminal under the CSA, Key's 1995 Conviction is a controlled substance offense and the Court should reject this argument.

### III.     Petitioner's Prejudicial Spillover Claim is Meritless

Key next claims that there was retroactive misjoinder at the Counts One (narcotics conspiracy) and Two (a related firearms count). As an initial matter, this claim was already considered and rejected by the Second Circuit during his appeal. The Second Circuit affirmed Key's murder-for-hire convictions and therefore noted that his prejudicial spillover argument was foreclosed. *United States v. Key*, 854 F.3d 163, 174 n.8 (2d Cir. 2017). Accordingly, Petitioner may not use Section 2255 to seek relief on a claim previously considered and rejected during his direct appeal. *See Cabrera v. United States*, 972 F.2d 23, 25 (2d Cir. 1992) ("As we have held previously, 'section 2255 may not be employed to relitigate questions which were raised and considered on direct appeal.'" (quoting *Barton v. United States*, 791 F.2d 265, 267 (2d Cir. 1986) (collecting cases))). Petitioner's claim also fails on the merits.

#### a.     Applicable Law

"The term 'retroactive misjoinder' refers to circumstances in which the 'joinder of multiple counts was proper initially, but later developments--such as a district court's dismissal of some counts for lack of evidence or an appellate court's reversal of less than all convictions--render the initial joinder improper.'" *United States v. Hamilton*, 334 F.3d 170, 181 (2d Cir. 2003) (quoting United States v. Jones, 16 F.3d 487, 493 (2d Cir. 1994)). "In order to be entitled to a new trial on the ground of retroactive misjoinder, a defendant 'must show compelling prejudice.'" *Hamilton*, 334 F.3d at 181 (quoting *United States v. Vebeliunas*, 76 F.3d 1283, 1293 (2d Cir. 1996)). "Compelling prejudice" is found where there is "prejudicial spillover" from evidence used to obtain a conviction that was subsequently dismissed or reversed. *Id*. "The

48

concept of prejudicial spillover . . . requires an assessment of the likelihood that the jury, in considering one particular count . . . was affected by evidence that was relevant only to a different count . . . ." *Id*. at 182.

"A defendant bears an extremely heavy burden when claiming prejudicial spillover." *United States v. Griffith*, 284 F.3d 338, 351 (2d Cir. 2002). The Second Circuit has established a three-part test for determining whether there has been prejudicial spillover from evidence admitted to support convictions that were later set aside. The test considers:

> whether the evidence introduced in support of the vacated count "was of such an inflammatory nature that it would have tended to incite or arouse the jury into convicting the defendant on the remaining counts," (2) whether the dismissed count and the remaining counts were similar, and (3) whether the government's evidence on the remaining counts was weak or strong.

*Hamilton*, 334 F.3d at 182 (quoting *Vebeliunas*, 76 F.3d at 1294).

The first prong is not met where the evidence on reversed counts was generally no more inflammatory than the evidence on counts of conviction. *Id*. Regarding the second prong, prejudicial spillover is unlikely to be found where the reversed counts and the counts of conviction are either "quite similar or quite dissimilar." *Id*. at 182-83. It is difficult to establish prejudice "where the reversed and the remaining counts arise out of similar facts, and the evidence introduced would have been admissible as to both." *United States v. Wapnick*, 60 F.3d 948, 954 (2d Cir. 1995). Moreover, the absence of prejudice "is most readily inferable where the jury has convicted a defendant on some counts but not on others," and "no case has held that a defendant was entitled, on the ground of retroactive misjoinder, to a new trial on the counts of conviction simply because the jury found the government's proof on other counts unpersuasive." *Hamilton*, 334 F.3d at 183.

49

### b.    Discussion

Under the three-part test used to determine whether a defendant has suffered prejudice from an alleged misjoinder, it is apparent that Key suffered no conceivable prejudice, even were the Court to assume that there was retroactive misjoinder--and there was not.[19]  The evidence that the Government introduced of Key's involvement in the murder plots was not more inflammatory than the evidence relating to Key's leadership of a violent drug trafficking organization. The extensive testimony at trial demonstrated that Key's organization was not a peaceful conspiracy--rather, it was a violent and dangerous large-scale illicit business. For example, Karriem Thomas testified that Smalls, one of Key's wholesale customers, was robbed of a kilogram of Key's drug which was worth about $60,000, and as a result he owed Key money and began pressuring Thomas for money to pay Key back. (Tr. 555-61). Canady testified that Key recruited Canady to help Key get money from a customer who had "skipped town with some of [Key's] work [drugs]." (Tr. 214). Key asked Canady to bring a screwdriver and then they went to the individual's home, job and neighborhood hunting for him. (Tr. 214-15).

Williams testified that on one occasion when he went to pick up crack from Davis, Williams saw Key on the couch counting money with a black and silver handgun next to him. (Tr. 1137-38). Williams also described an exchange where a coconspirator traded Key four handguns for Key's machine gun. (Tr. 1145-47). Tarleton also testified that when a drug customer owed Key large amounts of money in connection with drug debts, he also felt pressured to pay Key back quickly. (Tr. 1401-06). Indeed, after the drug customer and Key had a dispute, Key told Tarleton, "Fuck [the drug customer] and his brother. I get both of them killed. I got young niggas that will do anything for me." (Tr. 1410).

---

[19] This claim presupposes, with no support, that the charges related to the Allen and Harrison Murder Plots were somehow vacated.

Cooperating witness Bernard Folks described a violent war that occurred between members of Key's Crew and Harrison's Crew over drug turf. Folks testified that when Harrison refused to sell Key's product, violence erupted, resulting in several shootings, beatings, stabbings, and ultimately the murder of Harrison. (Tr. 799-829). Key's goal in orchestrating Harrison's murder was clear: to remove his drug-trafficking rival and to take back control of the drug-selling territory in and around the Courtlandt Projects. Key turned to a trusted associate Matthew Davis--the person storing kilograms of cocaine for the Organization--to kill Harrison. Likewise, Canady testified that Key told Canady that one of the reasons Key wanted to kill Allen was to ingratiate himself to Babilonia's family who procured cocaine from South America. (Tr. 227-228). Accordingly, the evidence regarding the murder plots was no more inflammatory than they evidence of how Key ran his incredibly violent drug trafficking organization.

Addressing the second prong, evidence of the Harrison Murder Conspiracy was also highly probative evidence of Key's operation as the head of a violent drug conspiracy, negating any possibility of prejudice. *See Hamilton*, 334 F.3d at 182-83 ("In cases where the vacated and remaining counts emanate from similar facts, and the evidence introduced would have been admissible as to both, it is difficult for a defendant to make a showing of prejudicial spillover."); *United States v. Wong*, 40 F. 3d 1347 (2d Cir. 1994) (evidence of a gunfight between the charged enterprise and a rival gang probative of the existence of the enterprise); *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (evidence of "gruesome murders and dismemberments" by members of a RICO enterprise "was certainly probative of the existence of the charged enterprise").

In sum, Key's regular use of others to settle violent disputes over his drug business, possession of firearms, and willingness to commit violence in connection with his drug business

51

was highly probative of Key's role as the head of a violent drug trafficking organization and was relevant and admissible separate and apart from the charges related to the Allen and Harrison Murder Plots.

Furthermore, even if the Allen Murder Plot had not been charged, because Canady provided powerful and supported testimony regarding Key's leadership of a vast, criminal organization, Canady was always going to be a witness in Key's trial and therefore Canady would have testified about his participation in the murder plot. Attacking Canady's credibility was a central theme of the defense in this case. Only by emphasizing the seriousness of Canady's crimes could the defense fully make its argument that the Canady had a strong incentive to curry favor with the Government. The notion that the defense would have limited or foregone this standard line of attack on Canady if the murder and related firearms counts had not been charged is implausible. *Cf. Unted States v. Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir. 1995) (holding that defendant waived claim of error based upon cooperating witness's testimony about witness's own murders and drug dealing where "[f]rom start to finish, the theory of [the defendant's] defense was that he was an innocent victim of false accusations made by unsavory drug runners who desperately wanted to curry favor with the government.").

Moreover, the evidence of Key's guilt on Counts One and Two was overwhelming, such that the third factor also weighs in favor of finding no prejudicial spillover. This evidence included, but was not limited to: (1) the testimony of five cooperating witnesses who identified Key as the head of a large, extensive and lucrative narcotics trafficking organization that involved distributing hundreds of kilograms of cocaine through New York City; (2) evidence of Key's unexplained wealth in the form of overlapping witness testimony, including testimony from five cooperating witnesses, the testimony of Key's jeweler, surveillance photographs of

52

Key's expensive cars, DMV records, evidence regarding Key's no-show job, and evidence that Key maintained an inexpensive vehicle to hide from law enforcement the success of his drug dealing business; (3) evidence that Key asked others to register an inexpensive car for Key to use to tamp down law enforcement's suspicions; (4) the wiretap of Davis's phone wherein Davis and Key discuss their narcotics business and wherein Davis talked to other co-conspirators regarding his criminal relationship with Key; (5) pole camera footage of Key repeatedly accessing a Bronx apartment where a subsequent search by the NYPD recovered drug packaging paraphernalia, including a blender and utensils, that was covered in cocaine residue; (6) searches of other stash apartments utilized by the Organization which yielded several kilograms of powder cocaine and other drug packaging materials, including grinders, plastic baggies, stamps, an ink pad, blenders, scales, a heat sealer, and a kilogram press; (7) NYPD surveillance video and photographs showing Key with several co-conspirators; (8) text messages recovered from Canady's phone between Key and Canady wherein they discuss a drug transaction; (9) the download of Jamal Smalls's phone showing a connection between Key and Smalls; (10) jail visitor logs demonstrating that Key visited Davis while Davis was incarcerated; (11) the testimony of several cooperating witnesses who described seeing Key with firearms on multiple occasions; and (12) text messages from Canady's phone where he and Key discuss Canady obtaining a firearm with a silencer from Key.

Finally, the absence of prejudice is readily inferable because the jury acquitted Key of Counts Seven through Nine (relating to the Harrison Murder Plot). *See Hamilton*, 334 F.3d at 183 ("The absence of such spillover is most readily inferable where the jury has convicted a defendant on some counts but not on others.") Accordingly, Key cannot demonstrate retroactive misjoinder, much less "compelling prejudice" from the purported misjoinder.

53

## THE COURT SHOULD DENY THE PETITION WITHOUT AN EVIDENTIARY HEARING

Where, as here, "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief," no hearing is required under § 2255. 28 U.S.C. § 2255(b). In particular, the Second Circuit has made clear that no hearing is required where (1) the allegations of the motion, accepted as true, would not entitle the petitioner to relief, or (2) the documentary record renders a testimonial hearing unnecessary. *Chang v. United States*, 250 F.3d 79, 85-86 (2d Cir. 2001) (confirming that "allegations of facts outside the record can be fully investigated without requiring the personal presence of the prisoner" and that it is within the court's discretion to determine whether a hearing is needed); *see also Dalli v. United States*, 491 F.2d 758, 760-61 (2d Cir. 1974) (holding that petitioner is entitled to hearing only if he "set[s] forth specific facts which he is in a position to establish by competent evidence"). On appeal, a District Court's denial of an evidentiary hearing will only be reviewed for abuse of discretion. *Chang*, 250 F.3d at 82.

Key's Petition makes claims unsupported by the law or the lengthy factual record in this case. For the reasons stated herein, a hearing is unwarranted because, even if true, Key's allegations would not entitle him to relief under Section 2255. *See id*; *Ramirez v. United States*, 185 F. Supp. 2d 246, 265 (E.D.N.Y. 2001) (finding no hearing required on Section 2255 motion where petitioner "has set forth no specific facts which raised any material issues of fact requiring a hearing").

## PETITIONER'S RULE 60 MOTION IS MERITLESS

On November 6, 2018, Petitioner filed a motion pursuant to Federal Rule of Civil Procedure 60(b) and (d) seeking relief from his conviction. The basis for this motion is that the

54

undersigned's "Oath of Office and Appointment Affidavit" ("OOAA") was allegedly not properly executed, rendering Key's prosecution invalid.[20]  While this claim fails for several reasons, including timeliness, the propriety of a Rule 60 motion at this juncture, and based on a misreading of the case law, the Government will focus on the merits since the Court can readily deny Key's motion on that ground.[21]

Key is simply wrong that there is any error in the undersigned's OOAA.  In response to a Freedom of Information Act ("FOIA") request, Key received a partially redacted version of the OOAA.  *See* Key Rule 60 Mot. Ex. B.  The response provided to Key noted that withholding portions of the requested record was justified pursuant to Title 5, United States Code, Section 552 (b)(6), which permits redactions when disclosure "would constitute a clearly unwarranted invasion of personal privacy."  Accordingly, the Executive Office for the United States Attorney sent Key a redacted copy of the undersigned's OOAA.  *See* Key Rule 60 Mot. Ex. C.  The copy of the OOAA sent to Key redacted (in white) the signatures of the appointee and of the human resources specialist, with the handwritten notation "b6" overlaying the redaction.  This is a clear reference to Title 5, United States Code, Section 552 (b)(6), which is demarcated as the basis for redaction in the same document.  In other words, the signatures are not missing, they are

---

[20] Key does not challenge the propriety of the OOAA executed by Adam Fee and Santosh Aravind, two other prosecutors assigned to the case who have since left the United States Attorney's Office.

[21] For example, this motion is untimely.  Pursuant to Fed. R. Civ. P. 60(c), to the extent Key's motion is predicated upon subsections (b)(1)-(3), the one year period has run.  Second, it is unclear whether or not Key is attempting to amend his habeas petition via a Rule 60 motion or is simply attacking his conviction directly via Rule 60. *See Gitten v. United States*, 311 F.3d 529, 534 (2d Cir. 2002) (new attacks on an underlying conviction "are beyond the scope of Rule 60(b)"). The procedural vehicle available to a defendant for collaterally attacking his criminal judgment is a motion for habeas corpus pursuant to Section 2255.

redacted pursuant to regulations governing privacy.  Accordingly, Key is incorrect that the

undersigned's OOAA was not properly executed.

## CONCLUSION

For the foregoing reasons, Key's Petition should be denied.

Dated:  New York, New York
        December 21, 2018

                              Respectfully submitted,

                              GEOFFREY S. BERMAN
                              Acting United States Attorney


                    By:     s/ Abigail S. Kurland
                            Abigail S. Kurland
                            Assistant United States Attorney
                            (212) 637-2955